NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0045n.06

No. 20-5416

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 22, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| NITZA SCARBRO, | ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| SOCIAL SECURITY ADMINISTRATION, | ) ) ) | |
| Defendant-Appellee. | ) ) | |

BEFORE:     SUHRHEINRICH, CLAY, and DONALD, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

## I.     BACKGROUND

Plaintiff Nitza Scarbro ("Scarbro") appeals the district court's grant of summary judgment to Defendant Andrew Saul, Commissioner of the Social Security Administration, on her Title VII claim of hostile work environment based on sexual harassment.[1]  We AFFIRM.

At all times relevant to this suit, Scarbro worked as a GS-12 Operations Supervisor at the Social Security Administration ("SSA") in the Nashville, Tennessee, Field Office.  Dan Phillips ("Phillips") worked as a GS-12 Staff Assistant in the same office.  District Manager Mark Blythe ("Blythe") and Assistant District Manager Joshua Horn ("Horn") were the second-line and first-line supervisors respectively for both Phillips and Scarbro.  Scarbro had worked with Phillips since

---

[1] Before the district court, Scarbro brought claims for gender discrimination, hostile work environment, and retaliation. On appeal, we are asked only to consider the hostile work environment claim.

2009, but before September 2012 they had never socialized with each other outside of the office or had any personal one-on-one conversations.

On September 30, 2012, Phillips approached Scarbro after a meeting and said he considered her to be a good friend and spoke with her about his marriage. He told her that he and his wife were having issues and that she wanted an open marriage and inquired whether Scarbro knew what an open marriage was. Scarbro replied that she thought he needed legal advice and left the room. Though she mentioned the conversation to a coworker, Carnita Davis, Scarbro did not complain to management following this meeting.

That same month, Scarbro was collecting seven dollars from each coworker for a management function. Phillips tried to give her ten dollars, but Scarbro refused to take it because she did not want to owe him the change. He told her that he did not want his wife to have his money, and that she was the only woman he wanted to have his money.

Also, in September 2012, Phillips approached Scarbro's cubicle and asked her to ask her husband how he dealt with being away from his kids for so long. She responded that she would not ask him, and Phillips walked away.

Sometime in October 2012, when Scarbro was leaving work, she saw Phillips parked at the end of the employee parking lot. When Davis asked him what he was doing, he gave her an answer and then drove away.

Sometime in early October 2012, Scarbro reported to Horn and Blythe that Phillips made her uncomfortable. She told Blythe that she wanted to talk to Phillips to try to resolve the situation rather than file a formal complaint. When she spoke with Phillips, he told her he did not know what she was talking about and that management had already told him to stop talking about his personal life at work because someone else had already complained about it. She alleges that he

then continued to approach her with "work related" questions that he did not really need to be asking her about.

The management team frequently had lunch together, but Scarbro stopped going to lunch with Phillips following the above incidents. In October or November 2012, Scarbro was going to lunch with another coworker and Horn. Horn invited Phillips to join them, and all four people rode in Scarbro's car. She testified that having Phillips in her car made her uncomfortable.

In December 2012, Horn asked the management group to include Phillips in their lunch plans. Scarbro told Blythe that she was uncomfortable going to lunch with Phillips, and Blythe agreed that she did not need to go to lunch with Phillips.

Scarbro later chose not to attend the office Christmas party because she did not want to be around Phillips. Blythe asked how things were going between her and Phillips, to which she replied that he had not come to her cubicle and she "was doing fine."

On January 2, 2013, Phillips approached Scarbro's desk and asked questions about how her holidays with her family had been and apologized for the comments he had made the previous year. Scarbro told him that he made her feel uncomfortable, he could not take back what he had said, and that he should only speak to her about business. After she complained about this incident to Blythe, Blythe advised her she could file a formal complaint, and per her request, he instead approached Phillips directly and told him not to talk to her about anything personal. Blythe assured Scarbro that Phillips would not be bothering her anymore, and Horn removed her from the workload involving medical cases that she shared with Phillips.

On June 5, 2013, Scarbro noticed that she and Phillips were the only managers scheduled to be on duty the following day. When she alerted Horn, he responded that he did not see a problem as he thought they had worked things out. Phillips repeatedly visited her desk and asked her about

things such as a pen, asked a question about a technician, and looked for things in a cabinet in the cubicle where she had set up.

On June 9, 2013, Scarbro became ill and was diagnosed with vertigo, which lasted four or five days. On June 24, 2013, she complained to Blythe that she and Phillips had been the only managers on duty on June 6, 2013. He said he could not do anything because it would look like he was picking on Phillips. On July 22, 2013, Scarbro reported what had transpired to a member of the Area Director's office, who told her that management had done what it could. On July 26, 2013, Scarbro asked Blythe if she could stay in her current cubicle, rather than rotate to one closer to Phillips. Blythe agreed.

On September 30, 2013, Scarbro was the supervisor assigned to close the office. Although Phillips had left the office before Scarbro, he was still in his car in the parking lot when she walked to her car. While she was sitting in her car, he drove up the parking lot and parked next to her for several minutes, then drove off. Scarbro reported this to Blythe the next day, but the entire office was furloughed the following day due to a government shutdown. Blythe spoke with the security guard, who said nothing happened, so Blythe dropped the matter.

On October 31, 2013, Scarbro requested to see an EEO officer and reported what had happened. Horn and Blythe complained that they had had to answer questions from a claims representative. Scarbro testified that she did not interpret their complaining as an attempt to pressure her to drop her complaint. In his affidavit to the EEO, Phillips testified that his habit was to sit in his car and check his messages and that on September 30, 2013, as he was leaving, he received another call, which was why he pulled off to the side by Scarbro. On December 10, 2013, Phillips was again in his car when Scarbro left work.

During the week of March 31, 2014, Scarbro was scheduled to close the office on Monday, Tuesday, Thursday, and Friday, a total of four days, because some of the other supervisors had scheduled leave on some of those days. She requested leave for Friday of that week. Horn approved her request and told her to arrange for another supervisor to close for her. Scarbro felt she was being treated differently because the other supervisors had scheduled their leave without having to look for someone else to close.

In June 2014, Phillips made negative comments about technicians in Scarbro's unit at two management meetings. Blythe told Scarbro that he and Horn would speak with Phillips about his remarks.

In October 2014, Scarbro applied for a position in a different SSA component, but she was not selected for the position. She testified that she did not know "what the recommendation was" from Horn or Blythe, and that she did not know if the reason she was not selected was because of them.

In December 2014, Phillips sent Scarbro an instant message telling her she needed to send a request for credit time, or he could not certify her time and attendance sheet. Phillips had been certifying the timesheets of other supervisors (like Scarbro) when Blythe and Horn were not available to do so. When Scarbro complained to Blythe about the instant message, he told the supervisors they were not to certify each other's time sheets.

On January 26, 2015, Phillips stayed in the office past 5:30 p.m. even though he had been told not to stay after hours when Scarbro was closing the office.

Finally, Scarbro alleged that on November 7, 2015, while she was meeting with Horn in his office, Phillips burped loudly from outside the office, which caused Horn to laugh. She testified

that this incident was unrelated to her complaint, but that it was an example of Phillips's poor behavior that management condoned.

Scarbro exhausted her administrative remedies through the EEO and was granted the right to sue. Scarbro filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), on September 23, 2015. The district court granted summary judgment to SSA on all of Scarbro's claims. The court found that Scarbro had failed to demonstrate that the undisputed facts on the record established conduct that was severe or pervasive enough to create a hostile work environment. The court therefore did not address the issue of whether SSA knew or should have known of the alleged harassment but failed to implement prompt and appropriate corrective action. This appeal followed.

## II.    ANALYSIS

We review de novo a district court's decision to grant summary judgment. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 433 (6th Cir. 2009). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001). "We affirm a grant of summary judgment where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015) (cleaned up).

To establish a prima facie case of hostile work environment based on sexual harassment under Title VII, the plaintiff must establish that:

> (1 ) the sexual harassment was unwelcome, (2) the harassment was based on sex, (3) the harassing behavior was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related

> to employment, and (4) the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

The conduct must be both subjectively and objectively severe and pervasive. The test is "(1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct 'severe or pervasive.'" *Williams v. Gen. Motors*, 187 F.3d 553, 568 (6th Cir. 1999). The conduct should be considered as a whole such that "even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Id.* at 563. "Among the factors to be considered are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351 (6th Cir. 2005) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Scarbro argues that she was frequently and routinely subjected to harassment by her coworker Phillips. Even accepting all her allegations as true, the conduct is not severe or pervasive sexual harassment under the standards outlined above, and therefore does not give rise to a claim for a hostile work environment. Though she testified that Phillips' conduct made her uncomfortable, and alleges that she suffered pain and illness resulting from the stress brought on by these interactions, Scarbro has failed to satisfy the objective prong of the inquiry. These incidents took place over a two-and-half year period and were seemingly minor in nature. Scarbro does not allege that any physical contact took place, nor does she allege that there were any sexual or romantic advances. Furthermore, other than the comments about an open marriage and her

being the only woman he wanted to have his money, she alleges no conduct that is even sexual in nature.

This court has repeatedly found that conduct that is far more vulgar and overtly sexual did not create a hostile work environment. A few examples will suffice. In *Clark*, we found that there was no hostile work environment where, over the course of two years, a male supervisor told sexual jokes, twice placed a vibrating pager against a female plaintiff's thigh and pulled on her overalls after she told him that she was wearing a thong underneath. 400 F.3d at 351. The court found that his behavior was "distasteful and boorish" but fell short of "being sufficiently pervasive, hostile, or abusive to support a legal claim of a hostile work environment." *Id*.

In *Burnett v. Tyco Corp.*, we found that a female employee was not subjected to a hostile work environment when over a six-month period her male manager placed a pack of cigarettes inside her tank top and bra strap, and made several lewd jokes, including telling the employee she had "lost [her] cherry." 203 F.3d 980, 981 (6th Cir. 2000). We concluded that even though the incident with the cigarettes might even be battery, the conduct as a whole was not sufficiently severe to create a hostile work environment. *Id.* at 984–85.

In *Morris v. Oldham County Fiscal Court*, we found there was no objectively hostile work environment where a male supervisor told lewd jokes, made a sexual advance on the female plaintiff during her performance evaluation, referred to her once as "Hot Lips," and made several isolated comments about her appearance. 201 F.3d 784, 790 (6th Cir. 2000).

Scarbro fails to point to a single case where this court has found a hostile work environment existed because of conduct similar to Phillips's. She has failed to allege any conduct that was severe or pervasive enough to create a hostile work environment.

But even if we did find the conduct satisfied this prong of a sexual harassment claim, the claim would still fail, because SSA appropriate corrective action. Although the federal government is typically protected by sovereign immunity, Congress has waived that protection for claims arising under Title VII. *See Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976); *Steiner v. Henderson*, 354 F.3d 432, 434–35 (6th Cir. 2003). Liability for a hostile work environment can be imposed upon an employer if the plaintiff can demonstrate that "the employer's response to the plaintiff's complaints 'manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 311 (6th Cir. 2016) (quoting *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013)). A response is likely adequate if it is "reasonably calculated to end the harassment." *Waldo*, 726 F.3d at 814 (internal quotation omitted).

The record demonstrates that Horn and Blythe took corrective action several times in response to Scarbro's complaints. They investigated her allegations, told Phillips not to speak to her about personal matters, respected her request not to have lunch with Phillips, allowed her to stay in a cubicle farther away from Phillips, asked him not to stay late in the office if she was closing, and ensured the two of them did not work on the same projects. Scarbro clearly wishes management had done more, but that alone is insufficient to demonstrate that they did not take appropriate action. *See Thornton v. Fed. Express Corp.,* 530 F.3d 451, 457 (6th Cir. 2008) ("[P]laintiff's dissatisfaction with the investigation does not justify her rejection of the corrective action."). In sum, because Scarbro failed to demonstrate a factual question as to whether the conduct at issue constituted severe or pervasive sexual harassment and whether SSA failed to take immediate and appropriate corrective action, SSA was entitled to summary judgement on the hostile work environment claim.

### III.   CONCLUSION

Because no reasonable juror would find Phillips' conduct was severe or pervasive enough to create a hostile work environment under Title VII, we **AFFIRM** the judgment of the district court.